IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **PUBLISH** |
| | ) | |
| v. | ) | CRIMINAL NO. 05-0059-WS |
| | ) | |
| JENNIFER LYNNE WEEKLEY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

This matter comes before the Court on defendant's Motion to Dismiss (doc. 15). The Motion has been briefed and is ripe for disposition at this time.

**I.  Background.**

*A.  Nature of Case.*

On February 24, 2005, a federal grand jury sitting in the Southern District of Alabama returned a one-count Indictment (doc. 1) against defendant, Jennifer Lynne Weekley ("Weekley"), charging her with misprision of a felony, in violation of 18 U.S.C. § 4. The Indictment alleged that on January 3, 2005, defendant had knowledge of a bank robbery committed by her husband, Jeremy Weekley ("Mr. Weekley"), at the BankTrust Bank branch on Cottage Hill Road in Mobile, Alabama. Despite such knowledge, according to the Indictment, defendant "did conceal the same and did not, as soon as possible, make known the commission of said felony" to appropriate authorities. (*Id.*) The Indictment further alleged that Weekley transported Mr. Weekley from the scene of the bank robbery.[1]

*B.  Trial and Sentencing Proceedings.*

This case proceeded to trial on June 8, 2005. At trial, Mr. Weekley testified that defendant had helped him plan various details of the robbery the night before and the morning of the crime. In particular, Mr. Weekley stated that defendant assisted him in selecting the target bank, preparing the

---

[1]  Defendant was not charged with the substantive offense of bank robbery, nor was she charged with aiding and abetting or being an accessory to same. The sole offense charged in the Indictment was misprision of a felony.

robbery note, and formulating the steps of how the robbery would transpire, and that she even shaved his head for him on the morning of the robbery to alter his appearance. (Tr. 52-53, 72-73.) On the morning of January 3, 2005, Mr. Weekley testified, the two of them drove by caravan to the vicinity of the target bank in separate vehicles, with defendant parking at a gas station several blocks away while Mr. Weekley carried out the robbery. (Tr. 53, 75.) Upon completing the heist (which netted $2,040 in cash), Mr. Weekley drove to the gas station, got into defendant's vehicle, and told her to go because he had just robbed the bank and a police cruiser was nearby. (Tr. 54, 75-76, 78.) Defendant transported Mr. Weekley to an auto repair shop in Mobile, accepted $240 in stolen money, and dropped him off at that location. (Tr. 54-55, 77.) At that point, the two parted company, with Mr. Weekley informing defendant that he was going to a crack motel in Mississippi. (Tr. 79-80.) After using some of the robbery proceeds to get his vehicle out of the repair shop, Mr. Weekley drove to Theodore, Alabama, to buy crack cocaine, then proceeded to a motel in Mississippi, where he rented a room and commenced a two-day drug binge that culminated in his apprehension by law enforcement authorities. (Tr. 55-56.)

The jury also heard the testimony of Janice Weekley, defendant's mother-in-law. Later in the day on January 3, 2005, defendant telephoned her mother-in-law and told her to watch the news that night. (Tr. 40-41.) When Janice Weekley asked defendant why, defendant simply reiterated that she should watch the news. (Tr. 41.) Shortly after the five o'clock news, defendant called Janice Weekley again and asked if she "had seen it." (*Id.*) When Janice Weekley responded that she had missed the news broadcast, defendant suggested that she catch the late news. (*Id.*) Janice Weekley did watch the ten o'clock news, at which time she saw a photo of her son robbing the BankTrust branch, with a telephone number on the screen to contact authorities with information about the crime. (*Id.*) The next morning, Janice Weekley called that number and notified the FBI that her son was the person depicted in the bank robbery photograph on television. (Tr. 42.) FBI agents interviewed her shortly thereafter, at which time Janice Weekley disclosed her communications with defendant the previous day. (Tr. 43.)

Armed with this information from Janice Weekley, FBI Task Force Agent Wayne Farmer contacted defendant and arranged to meet with her at a neutral location at 10:30 a.m. on January 4.

(Tr. 85-86.) Agent Farmer testified that defendant supplied the following information to him during that interview: (i) the last time she saw Mr. Weekley before the robbery was on the evening of the 2nd, at which time he said he was planning a robbery, but she had not believed him; (ii) at 9:50 a.m. on the 3rd Mr. Weekley had called her and asked her to pick him up from a gas station, which she did; and (iii) when she picked her husband up from the service station, defendant had no idea that he had just robbed a bank. (Tr. 87.)

Based on leads developed during the investigation, law enforcement officials captured Mr. Weekley at the motel in Mississippi on the evening of January 4. (Tr. 88.) That night, he confessed to the robbery and informed law enforcement of defendant's involvement and complicity in the offense. (*Id.*) On the evening of January 10, one week after the robbery, Agent Farmer conducted a second noncustodial interview with defendant. (Tr. 88-90.)[2] According to Agent Farmer, defendant's statements during this second interview differed markedly from those she had made previously. In the January 10 interview, defendant confessed that she had helped Mr. Weekley plan the robbery, that she had cut his hair on the morning of the robbery, that she had helped draft the verbiage on the robbery note, and that she had driven to the gas station to wait for him while he committed the robbery so that he could abandon the getaway vehicle at that location. (Tr. 90-91.)

After hearing the evidence and the arguments of counsel, and after being instructed on the applicable law, the jury returned a guilty verdict against defendant as to Count One on June 8, 2005. On September 23, 2005, the Court sentenced defendant to a term of imprisonment of 36 months, to be followed by a one-year supervised release term, and a $100 special assessment. (Doc. 40.) Defendant has filed a Notice of Appeal (doc. 39) from her conviction and sentence.

### C.   *Defendant's Motion to Dismiss.*

Near the end of the trial, defense counsel argued for the first time that the Indictment must be dismissed because any conviction would necessarily be predicated on a violation of Weekley's Fifth

---

[2]   Defense counsel never filed a motion to suppress Weekley's statements to law enforcement officers during either of the two interviews. Based on the evidence elicited a trial, any such motion would have been futile, given the voluntary, noncustodial nature of those interviews.

Amendment privilege against self-incrimination. In particular, defense counsel reasoned that Weekley had been charged with failing to report a bank robbery in which she herself had been substantially involved in both the planning and execution stages. According to defense counsel, Weekley could reasonably have believed that by reporting the robbery to law enforcement authorities, she would be incriminating herself. To prosecute her for failing to report that offense, defense counsel maintained, would be to punish her for exercising her Fifth Amendment right not to incriminate herself. After hearing oral argument from counsel, and without the benefit of briefs or substantial legal research by either side as to this objection, the Court denied defendant's oral motions for judgment of acquittal and to dismiss.

Five days after the jury found her guilty, defendant filed a Motion to Dismiss (doc. 15) and a supporting memorandum of law. In the Motion, defendant amplified her contention that the Indictment infringed upon her Fifth Amendment privilege because "a person cannot be required to report information to authorities which conceivably can be used to prosecute the person" (Motion, ¶ 2), yet the Indictment sought to hold her criminally responsible for failing to make such a report. The Motion asserts that the Indictment is defective and must be dismissed for that reason.[3] After a three-month delay to accommodate preparation of the trial transcript, the Government submitted a memorandum of law in opposition to the Motion to Dismiss. Defendant filed her reply brief on September 20, 2005, the eve of her sentencing hearing, at which time the Motion to Dismiss became ripe.

## II.     Analysis.

### A.     *Elements of Offense.*

"Although the term 'misprision of felony' now has an archaic ring, gross indifference to the duty to report known criminal behavior remains a badge of irresponsible citizenship." *United States v. Ward*, 757 F.2d 616, 620 (5th Cir. 1985) (citation omitted). Misprision may be a sparsely prosecuted crime, but its parameters are clearly delineated in the caselaw. In particular, the elements of a violation

---

[3] The law is clear that "[f]ederal courts possess the power and duty to dismiss federal indictments obtained in violation of the Constitution or laws of the United States." *United States v. Holloway*, 74 F.3d 249, 253 (11th Cir. 1996) (dismissing indictment based on compelled testimony from defendants, on ground that such indictment violated the Self-Incrimination Clause).

of 18 U.S.C. § 4 are as follows: (1) commission and completion of a felony offense by a principal; (2) actual knowledge by defendant of the commission of such a felony; (3) failure by defendant to notify authorities; and (4) an affirmative act by defendant to conceal the crime. *See United States v. Gebbie*, 294 F.3d 540, 544 (3rd Cir. 2002); *United States v. Cefalu*, 85 F.3d 964, 969 (2nd Cir. 1996); *United States v. Adams*, 961 F.2d 505, 508 (5th Cir. 1992). As these elements make clear, misprision "requires both knowledge of a crime and some affirmative act of concealment or participation." *Itani v. Ashcroft*, 298 F.3d 1213, 1216 (11th Cir. 2002) (citation omitted). A misprision prosecution cannot succeed absent proof that the defendant took steps to conceal the crime; after all, "mere failure to report a known felony would not violate 18 U.S.C. § 4." *Id.*; *see also United States v. Davila*, 698 F.2d 715, 717 (5th Cir. 1983) ("mere failure to report a felony is not sufficient" to sustain a misprision conviction, which also requires "some positive act designed to conceal from authorities the fact that a felony has been committed"); *United States v. Ciambrone*, 750 F.2d 1416, 1418 (9th Cir. 1984) ("mere silence, without some affirmative act, is insufficient evidence of the crime of misprision of felony").

### B.     King *and Its Progeny.*

The Self-Incrimination Clause of the Fifth Amendment prohibits "infliction of criminal penalties on the basis of compelled, testimonial self-incrimination." *United States v. Gecas*, 120 F.3d 1419, 1428 (11th Cir. 1997). In policing defendants' Fifth Amendment right against self-incrimination, courts are charged with "ensuring that [any] compelled testimony can in no way lead to the infliction of criminal penalties." *Id.* This constitutional doctrine predictably creates complexity when juxtaposed with the failure to report element of a misprision offense. Although 18 U.S.C. § 4 imposes an obligation on one with knowledge of a felony to report it, what happens when the individual's knowledge of the underlying offense might reasonably subject her to criminal prosecution if she disclosed it to authorities? Stated differently, how can a defendant's duty to report under 18 U.S.C. § 4 be reconciled with her Fifth Amendment privilege not to incriminate herself?

More than 30 years ago, an emergent line of authority determined that it is unconstitutional under the Fifth Amendment to apply the misprision statute to prosecute one implicated in a felony for

not reporting that offense to proper authorities, when making such a report would likely incriminate the defendant. Perhaps the earliest case to espouse this view was *United States v. King*, 402 F.2d 694 (9th Cir. 1968), in which the defendant was convicted under 18 U.S.C. § 4 for failing to report a bank robbery. The evidence in *King* reflected that the defendant had been privy to and had participated in several conversations with a trio of bank robbers about that crime both before and after they completed the offense. Pursuant to these conversations, the trial court found, the defendant received a portion of the robbery proceeds and transported two of the robbers to an apartment from which they were planning to leave town until things "cooled off." On appeal, the Ninth Circuit questioned whether there was sufficient evidence to support the trial court's finding of concealment, as needed to sustain a misprision conviction. Even if there were, the *King* panel opined, "a constitutional question is then presented concerning defendant's privilege against self-incrimination, guaranteed by the Fifth Amendment." *Id.* at 697. The court elaborated that if the defendant had reported the robbery, "he necessarily would have attracted police attention to his own association with the principals" at the meetings about the robbery and "would thus have risked being charged as an aider and abettor, or as an accessory after the fact." *Id.* Because the defendant had reasonable cause to believe that reporting the bank robbery could lead to his prosecution as an aider and abetter, or as an accessory, the *King* court held that the Fifth Amendment privilege against self-incrimination precluded conviction of defendant under 18 U.S.C. § 4.

In the wake of *King*, several other appellate courts have reached similar conclusions as to the constitutionality of 18 U.S.C. § 4 as applied in circumstances where it would conflict with a defendant's Fifth Amendment privilege against self-incrimination. *See United States v. Jennings*, 603 F.2d 650, 652-54 (7th Cir. 1979) (reporting narcotics sale to appropriate authorities would have provided link in chain of evidence which could have led to defendants' prosecution for criminal acts, so misprision conviction would violate self-incrimination privilege); *United States v. Kuh*, 541 F.2d 672, 677 (7th Cir. 1976) ("we cannot accept the argument that, although a person who fails to disclose a felony in which he might be implicated is protected from punishment by the Fifth Amendment, his failure to make known the felony, when coupled with an act of concealment, makes him susceptible to prosecution,

conviction, and punishment under 18 U.S.C. § 4"); *United States v. Pigott*, 453 F.2d 419 (9th Cir. 1971) (reversing misprision conviction where defendant was simultaneously involved in bank robbery at the moment when her duty to report the crime arose, and reasoning that Fifth Amendment must prevail in collision with misprision statute); *United States v. Graham*, 487 F. Supp. 1317, 1319-20 (W.D. Ky. 1980) (following *Kuh* and holding that Fifth Amendment prohibited misprision prosecution where, at time duty to report arose, defendants were engaging in what they could reasonably believe to be criminal conduct, such that notification of authorities "would compel defendants to give information which might tend to show they had committed a crime"). Such determinations have been particularly strident where a perpetrator of the underlying offense is charged with misprision. *See United States v. Warters*, 885 F.2d 1266, 1275 (5th Cir. 1989) ("successful prosecution for misprision of one guilty of the underlying offense will usually be impossible because of the defense that the failure to make known was an exercise of the constitutional right to refrain from self-incrimination"); *but see Davila*, 698 F.2d at 719 (defendant who pleaded guilty to misprision could not raise self-incrimination challenge even though he had been participant in underlying conspiracy to suborn perjury, inasmuch as guilty plea effects waiver of Fifth Amendment privilege).

   Although the Eleventh Circuit has not weighed in on the interplay between the misprision statute and the Self-Incrimination Clause, the Court is persuaded that the reasoning of *King* and its progeny is sound as a matter of constitutional law.[4] The Government does not contend otherwise. Therefore, the Court finds that, as a general proposition, a defendant cannot be prosecuted under 18 U.S.C. § 4 for failing to report a felony if that defendant had reasonable cause to believe that furnishing the government

---

   [4]  In that regard, the Court is swayed by two principal factors. The first is the compelling notion that where a criminal statute clashes with the Fifth Amendment privilege against self-incrimination, that privilege must prevail. To hold otherwise would be to subordinate a vital constitutional freedom to a legislative decision by Congress, which would effectively turn the hierarchy of legal authorities on its head. The second is the apparent unanimity with which the extant authorities have treated this issue. There appears to be no split of authority and no question among courts addressing this issue post-*King* that 18 U.S.C. § 4 must yield to the Self-Incrimination Clause where the basis of a prosecution under the former is a defendant's failure to report a felony that might reasonably subject herself to criminal penalties.

with such knowledge could lead to her own prosecution.

### C.     Applicability of Privilege to Defendant.

Nonetheless, the foregoing authorities make clear that these black-letter principles must not be implemented in a vacuum; rather, they must be applied with due consideration for the specific circumstances of the particular case. *See, e.g., Jennings*, 603 F.2d at 655 (carefully limiting holding "to the facts of this case"); *Kuh*, 541 F.2d at 677 (taking pains to confine its holding as to the interplay between misprision statute and Self-Incrimination Clause to the factual circumstances of that case); *see generally Warters*, 885 F.2d at 1275 (explaining that misprision conviction of a perpetrator of the underlying offense "is not theoretically impossible," and implying need for case-by-case determination). Therefore, the undersigned eschews any adoption of a *per se* rule, and instead examines how these precepts apply to the particular circumstances confronting Weekley.

Had Weekley simply remained silent after whisking Mr. Weekley from the vicinity of the crime, her self-incrimination argument would resonate strongly. After all, she was intimately involved in orchestrating the bank robbery, with input into such details as which financial institution would be targeted, what the robbery note should say, and how Mr. Weekley should conduct himself during the robbery. During the getaway, Weekley knowingly accepted stolen money from her husband. Given these circumstances, had defendant come forward to report her knowledge of the bank robbery to appropriate authorities, she would have been certain to divert unwanted law enforcement scrutiny onto herself and could reasonably have expected to face prosecution for her role in the robbery. To prosecute defendant under 18 U.S.C. § 4 for failing to notify authorities in those circumstances would be tantamount to prosecuting her for exercising her Fifth Amendment privilege against self-incrimination. In that event, the *King* line of authority would be directly on-point, the Indictment would fail to pass constitutional muster, and she would be entitled to dismissal of that Indictment to safeguard her constitutional rights.

But Weekley did not remain silent. At trial the Government's case emphasized two acts of concealment undertaken by Weekley. The first was that she transported her husband away from the robbery area. The second was that she lied to the FBI when they inquired about the robbery the next

morning.[5] She told Agent Farmer that she had not seen Mr. Weekley between the evening of January 2nd and the time of the robbery, when in fact she had been with him the entire time plotting the crime. She said that he had called her to ask her to pick him from a gas station for reasons unknown to her, when in fact she was waiting at the gas station, their designated meeting spot for the getaway after Mr. Weekley completed the robbery. She said that when she picked him up she had no knowledge that Mr. Weekley had robbed a bank, when in fact she had very good reason to believe that he had. A reasonable jury viewing this evidence could have determined that both (a) Weekley knowingly made false statements about the robbery to Agent Farmer on January 4, 2005; and (b) Weekley made such statements as an affirmative step to conceal the crime.

When the FBI contacted her on the morning of January 4, defendant had two lawful options. First, she could have chosen to say nothing, thereby preserving her Fifth Amendment privilege against self-incrimination as set forth above. Second, she could have chosen to respond truthfully to the FBI's questions.[6] Instead, Weekley lied. But lying was not a lawful alternative for her, inasmuch as those false statements, in and of themselves, constituted an affirmative act of concealment sufficient to support a misprision conviction. *See Ciambrone*, 750 F.2d at 1418 (holding that truthful, but partial, disclosure of knowledge to authorities is not a sufficient act of concealment to support misprision conviction, but that lying to authorities would be). Moreover, defendant's knowing false statements to law

---

[5] The lies to law enforcement were a cornerstone of the Government's case. Agent Farmer testified specifically about Weekley's misrepresentations to him on January 4. And during closing argument, the Government repeatedly touched on this issue, arguing at one point that "[m]aking it known is not first lying to the cops when they come and ask you and then a few days later telling the truth when they ask you." (Tr. 130.) The Government also asserted to the jury that "[s]he told them stories when they came and talked to her in an effort she took to conceal. That's the gist of misprision of a felony, that you take some act to conceal it." (Tr. 131.) Hence, there is no doubt that defendant's false statements to Agent Farmer on January 4, 2005 were a key evidentiary pillar on which the prosecution rested its proof of the 18 U.S.C. § 4 violation.

[6] Such truthful statements would likely have stymied any misprision prosecution against her, inasmuch as truthful cooperation in the interview would have rendered it problematic for the Government to establish both the "failure to report" and the concealment prongs of an 18 U.S.C. § 4 violation.

enforcement authorities on the morning of January 4, 2005 negate her ability to invoke the Self-Incrimination Clause as a defense to the ensuing misprision prosecution.

In the words of Justice Scalia, "[w]hether or not the predicament of the wrongdoer run to ground tugs at the heartstrings, neither the text nor the spirit of the Fifth Amendment confers a privilege to lie." *Brogan v. United States*, 522 U.S. 398, 404, 118 S.Ct. 805, 139 L.Ed.2d 830 (1998); *see also United States v. Veal*, 153 F.3d 1233, 1240 (11th Cir. 1998) ("we note that the Supreme Court has been resolute in holding that the Fifth Amendment does not shield perjured or false statements"). As such, Weekley's knowing false statements to the FBI on the morning of January 4, 2005 were not protected by any Fifth Amendment privilege. Those false statements lie at the heart of the Government's theory for prosecuting her under 18 U.S.C. § 4 in two respects. First, they constitute a requisite affirmative act of concealment to support a charge of misprision of a felony.[7] Second, and more importantly, the Government relied on those same false statements at trial to establish the "failure to report" element of the offense. Simply put, Weekley's privilege to refrain from incriminating herself (and, hence, not to report the robbery) melted away when she voluntarily lied to the FBI about the robbery. At that point, her duty to report the crime was no longer counterbalanced by a Fifth Amendment privilege.

Under this analysis, then, Weekley's violation of 18 U.S.C. § 4 was complete the moment she lied to Agent Farmer about her knowledge of the bank robbery, where those false statements violated her duty to report the offense, neutralized her Fifth Amendment privilege, and constituted the necessary affirmative act of concealment. Because those statements were unquestionably not protected by the Self-Incrimination Clause, the Government's reliance on them in indicting and convicting Weekley in no way implicates her Fifth Amendment rights. *See United States v. Sessions*, 2000 WL 1456903, *1 (8th Cir. Oct. 2, 2000) (holding that defendant who was complicit in burglary of gun shop had no Fifth Amendment privilege to defeat misprision prosecution, where he "gave the police partial information

---

[7] Of course, the Government also had other evidence of concealment, including specifically the evidence that Weekley had transported her husband from the vicinity of the *locus delecti*.

[about the burglary] that was misleading").[8]

In response to the Government's argument that her statements to Agent Farmer were beyond the pale of Fifth Amendment protection, Weekley attempts to distinguish *Brogan* and *Sessions* by saying that they state only that <u>sworn</u> false statements are outside the realm of Fifth Amendment protection, while Weekley's false statements to Agent Farmer were not under oath. (Reply Brief, at 2.) This sworn/unsworn dichotomy urged by defense counsel has no bearing on the constitutional analysis. A defendant who makes false statements cannot later invoke her privilege against self-incrimination as to those statements, irrespective of whether they were sworn or unsworn. *See, e.g., Veal*, 153 F.3d at 1241 (observing that, for purposes of Fifth Amendment protection, it is irrelevant whether a statement is made under oath or not). Likewise, defendant's correct observation that *Brogan* was not a misprision case in no way blunts or precludes its applicability to the 18 U.S.C. § 4 context, where that decision lays bare the limits of the Fifth Amendment privilege against self-incrimination.

### III.   Conclusion.

For all of the foregoing reasons, defendant's Motion to Dismiss the Indictment as violative of her Fifth Amendment rights is **denied**.

DONE and ORDERED this 6th day of October, 2005.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[8]   In reaching this conclusion, the Court does not endorse any blanket rule about when a misprision charge can overcome the Fifth Amendment privilege. Rather, the Court finds merely that under the specific facts of this case, as adduced at trial, there was ample evidence from which a jury could find Weekley guilty of violating 18 U.S.C. § 4 without infringing upon her privilege against self-incrimination.